## J. R. STARK v. ALFORD & VEAL.

1. MEASURE OF DAMAGES—DEFECTIVE MACHINERY.—The measure of damages in an action for the breach of a contract to deliver specified machinery, is the difference in value between the machinery as furnished and as contracted for.

2. SAME—HOW ASCERTAINED—EXPERTS.—This difference may be ascertained by the testimony of experts, taking the contract price and expense of delivery as the basis, and estimating the difference between that amount and the value of the machinery actually delivered ; or by ascertaining the reasonable cost of supplying the deficiency or of remedying the defects of the machinery as delivered.

3. SAME—PARTIES.—All parties interested in the contract to sell are responsible to the purchaser for whatever damages he may have sustained from a breach of the contract.

4. ACCEPTOR PAYING BEFORE MATURITY.—An acceptor of a bill drawn by the purchaser of machinery cannot, by paying the bill before maturity, change the relations of the original parties to it and to each other, and thus cut off the drawer from the defense of failure of consideration, from defects in the machinery so purchased.

5. SAME.—The acceptor paying before maturity is not a holder for value of the paper, as against the drawer.

6. DRAWER AND ACCEPTOR.—The liability of the acceptor is to pay according to the terms of the contract. His remedy, as against the drawer, then, is for money had and received by him, of which the bill is the evidence.

7. SAME—SURETY.—An acceptor, even though he may have been surety for the drawer to the payee for machinery purchased by the drawer, in paying before maturity is subject to any defense which could be made by the maker, if sued by the payee.

APPEAL from Houston. Tried below before the Hon. A. T. McKinney.

The facts are fully given in the opinion.

*W. A. Stewart* and *Nunn & Williams*, for appellants.—We submit, that there is plenty in the record to show that Alford & Veal are in no better position than the Washington Iron Works.

And, first, we submit that they are original parties to the contract. (Smith's Mer. Law, 264; 1 Pars. on Cont., 250; Chitty on Cont., 28; Hoffman & Co. *v*. Bank of Milwaukee, 12 Wall., 181.)

Second. "Original parties cannot set up plea of innocent holder of negotiable paper." (Smith's Mer. Law, 336; Kent's Comm., 96–98; 1 Pars. on Cont., 256; Watson *v*. Flanagan, 14 Tex., 354; Story on Bills, sec. 187; Chitty on Cont., 28.)

Third. A promissory note or bill of exchange transferred out of due course of trade, cannot be collected by holder, if the maker have a meritorious defense. (3 Kent's Comm., 97 and note C, and 98.)

We presume it will not be seriously contended that Alford & Veal, the drawees of the bill, could discount the same before maturity and pay it, and then claim to have received the note in due course of trade, and to be innocent holders. This could not be said to be in due course of trade. They are the parties ordered to accept, and at maturity pay. They had no right to pay before maturity. They are original parties to the

transaction, and affected with all defenses that could be urged against the payor. (2 Kent's Comm., 8th ed., p. 593; Chitty on Cont., 28.)

Fourth. The draft and deed of trust conveyed notice to Alford & Veal of the nature of the contract, and therefore of the possibility of failure of consideration, and they cannot be heard to say, after purchasing such paper, that they are innocent holders. (Howard *v.* Kimball, 6 Am. Rep., 740; 65 N. C., 175.)

Fifth. In addition to the above, the appellees had actual notice of the entire trade. * * * *

In addition to what we have heretofore said, we would submit, that the acceptance by Alford & Veal of the draft made them the parties primarily chargeable, and their recourse, depending on the facts, would be on the drawer for money advanced to his use. The payment of the draft was an extinguishment of the draft, and with it expired the deed of trust. (Close *v.* Fields, 2 Tex., 238; Pridgen *v.* McLean, 12 Tex., 421; Duty *v.* Graham, 12 Tex., 427.) And this is the effect, although the money had been paid before maturity, by way of purchase. (Smith's Mer. Law, 294.)

The presumption was, that the funds of Stark were in their hands when they accepted; but, otherwise, their remedy was by assumpsit, basing their claim on the payment without funds and the liability of Stark to make repayment. In Close *v.* Fields, 2 Tex., 235, the court says:

"That according to the principles of liability of the drawer to the acceptor for accommodation, the acceptor can never sue on the bill; he must sue as for money loaned or paid to the use of the drawer." (Chitty on Bills.)

It is true, that in the case of Sublett *v.* McKinney, 19 Tex., 438, the court seems to have modified this rule; but even now, we submit, there is no more than a recognition of an equitable right to substitution, and we think it would be necessary for the acceptors paying without funds to invoke the equitable powers of the court in aid of their rights. There-

fore, the proceeding to sell the machinery under the trust deed, after the payment of the draft, was illegal and unwarranted.

We would invite attention to the peculiar manner of the acceptance of this draft. It is on separate paper, and stipulates that, if funds are not provided for its payment at maturity, the acceptors shall have an extension of sixty days thereafter. This clearly shows that the acceptors, as well as the payees, well understood the fact that Stark was relying on the products from his mill as a means for providing funds with which to pay, and that it was possible he might fail to make payment punctually. We would submit, that the record shows that the entire failure proceeded from the defects in the machinery.

According to the most favorable rule that could be contended for under the decision in the case of Sublett v. McKinney, *supra*, the acceptors could only ask substitution or subrogation under rules applicable to sureties paying the debts of their principals; and we are not aware of any case where they could invoke this rule, except after having been compelled to pay the debt, in obedience to their obligation and contract. We cannot conceive of any rule of law or equity that would enable them to step forward, in advance of any just obligation or liability of theirs, and pay off a debt against their principal, that, in point of fact, had no legal existence, and before the time set for its payment, and then claim the rights of subrogation, and at the same time to be innocent holders of mercantile paper, whereby to defeat their principal in the defenses he had against such a claim. And the rights of subrogation, under which alone Alford & Veal could claim to enforce the trust deed, would only secure to them such rights as pertained to the creditor, and would also subject them to such defenses as might have been urged against the creditors. Mr. Story, in his excellent treatise on equity jurisprudence, in discussing this question, seems to take as an essential condition to the right of the surety to recover against

his principal, that "he should be compelled to pay the debt." (1 Story's Eq., p. 544, sec. 492.)

And again, it is conceded that the rights of subrogation, whatever they may be, are based on the presumed assent of the principal that he make payment, "because [it is said] a person cannot make himself the creditor of another by volunteering to discharge his obligations." (See note to section 499*d*, p. 565; also, for full discussion of this subject, sections 492–500.)

Had they waited till it had become their duty to pay under the contract, and had received no notice from the drawer not to pay, then, it is conceived, the drawer would be without remedy had they paid the debt.

But concede that they stand as sureties, and are subrogated to the rights of the creditor, then have they any more or better rights?

To avoid this objection, they claim to be innocent holders of mercantile paper, thereby placing themselves in two very distinct and antagonistic positions in reference to the contract.

In further support of the position that the acceptors had no right to pay before maturity, we would call attention to the case of the First National Bank of Jersey City *v.* Leach, decided by the Supreme Court of New York, (11 American Reports, 710; 52 N. Y., 350,) in which the court, in discussing the relative rights of the bank and the drawer of a check after certification of the check, says: "The acceptance of a time draft before due is entirely different. There, the holder has then no right to the money, and the acceptor no authority to pay, until the maturity of the bill. There is no necessity for presenting a check for acceptance, like a time bill; no authority for such presentment—although the holder has the right to do it."

*Moore & Spence*, for appellees.

1. The law refuses to take into consideration any damages

remotely resulting from the act complained of. (Sedg. on Dam., 57; Calvit *v.* McFadden, 13 Tex., 324.)

2. Fraud on the part of the holder of a bill of exchange, is the only ground on which the consideration can be inquired into. (Salmon *v.* Gibson, 1 Hill, 308; Chitty on Bills, sec. 89; Story on Bills, 546, 547; Parsons' Merc. Law, 124; Magee *v.* Badger, 34 N. Y., 247; Paschal's Dig., 221.)

3. The plea in reconvention by the plaintiff, seeking to offset the damages from the breach of the contract of guaranty against the bill in the hands of Alford & Veal, ought to have been stricken out. The damages, being unliquidated, could not be set off against the bill of exchange. (Benjamin on Sales, 685; Chitty on Bills, sec. 93; 1 Parsons on Notes and Bills, 207, 210; Morgan *v.* Richardson, 1 Camp. N. P., 40; Tye *v.* Gwynn, 2 Camp. N. P., 346; Parish *v.* Stone, 16 Pick., 198; Sayles on Pl., sec. 157; Danl. Ch. Pr., sec. 1743; Story's Eq. Pl., 400; Egery *v.* Power, 5 Tex., 501; Castro *v.* Gentiley, 11 Tex., 28; Duncan *v.* Magette, 25 Tex., 250.)

4. Alford & Veal, under the facts, were innocent holders of the bill, and entitled to protection as such. (Paschal's Dig., 221, 227; Jackson *v.* Marshall, 6 Tex., 329; 2 Pars. on Bills and Notes, 19, 33, 40; Chitty on Bills, sec. 170, 171; Story on Bills of Ex., sec. 207; Pars. Merc. Law, 122, 123; Byles on Bills, sec. 113, p. 214; Story on Prom. Notes, sec. 191, 197; Smith's Lead. Cas., 250; Greneaux *v.* Wheeler, 6 Tex., 522; Weathered *v.* Smith, 9 Tex., 625; Butler *v.* Robertson, 11 Tex., 142; Claiborne *v.* Yoeman, 15 Tex., 44; Ross *v.* Smith, 19 Tex., 172; Rider *v.* Duval, 28 Tex., 624.)

5. Alford & Veal had absolutely bound themselves to pay the bill by giving a valid acceptance. "An acceptance may be in writing on the bill itself, on another paper, or verbal." (Chitty on Bills, secs. 222, 223.) "A promise to accept a bill thereafter to be drawn, specifying the amount and time of payment, so as to leave no reasonable doubt as to the identity of the bill to be accepted, is, if shown to a third person, who on the faith of such promise takes the bill for a valuable con-

sideration, in point of law an acceptance, binding the person making the promise." (Parker v. Greele, 2 Wend., 545.) "A valid agreement to accept may be declared on as an acceptance." (Ontario Bank v. Worthington, 12 Wend., 593; Parsons' Merc. Law, sec. 129, and note; 7 Curtis, 560; 8 Curtis, 68; Story on Bills, sec. 244.) And this acceptance, once issued, could not be revoked. (Smith's Merc. Law.) "When acceptance is once made, if the bill has been delivered to the holder, the transaction is complete, and the acceptance is irrevocable." (Story on Bills, sec. 252; Smith's Merc. Law, 91; Parsons' Merc. Law, sec. 100; Byles on Bills, 256; Story on Bills, sec. 164; Chitty on Bills, 218, 219, and notes; Story on Bills, 142; 1 Parsons on Notes and Bills, 54.) "Acceptor cannot plead that he received no consideration." (1 Parsons on Notes and Bills, 180, 184, and note; Chitty on Bills, secs. 239, 240.)

6. The law does not sustain the position, that because Alford & Veal were acceptors, that fact alone was sufficient to affect them with notice of the consideration of the bill and the equities that might arise against it. "The payee is a stranger to the acceptor." (1 Parsons on Notes, 79.) "The payee is regarded as a stranger to the acceptor as respects the consideration." (1 Parsons on Notes and Bills, 180.) In Story on Bills, sec. 187, we find the parties between whom the consideration in certain contingencies may be inquired into. These are, "in an action by drawer against the payee, and the payee against his own indorser, and by acceptor against the drawer"; but we nowhere find authority for the drawer to plead "failure of consideration" against acceptor, where acceptor had no funds of the drawer in his hands. If, then, the acceptance was irrevocable, and they were absolutely bound to pay the bill in the hands of any bona-fide holder, surely the drawer, Stark, must be bound to them. But we rely upon our position as bona-fide holders of a draft transferable by delivery. We claim that Alford & Veal have the same right to demand payment from the drawer, Stark,

that any holder of a genuine bank bill has to demand payment from the bank that issued it. (Parsons' Merc. Law, secs. 125, 126; Story on Bills of Ex., sec. 200.)

We contend, that a bill of this kind is not only a pure bill of exchange, but, if the expression be correct in commercial parlance, we would call it one of the most negotiable class; that is, that it is more free from clogs or impediments to free circulation, than any other class of commercial paper; because, when once issued, it is, like bank paper, transferable by simple delivery, and becomes the property of the holder, subject to no equities. This bill might have passed through many hands before maturity, and might have become the property of a distant holder,—of one who might have been a perfect stranger to all the parties, and ignorant of all the circumstances under which it was issued. It will surely not be contended, that Stark's plea of "failure of consideration," in the form of unliquidated damages, would have been good against the bill in the hands of such a holder. "A note that is void in the hands of the payee, because obtained by him from the maker through fraud, is collectible in the hands of a subsequent *bona-fide* holder for value, who obtained it before maturity." (Holcomb *v.* Wyckoff, 10 American Rep., 219; 35 N. J., 35.) "And consideration cannot be inquired into." (Byles on Bills, 191; Parsons' Merc. Law, secs. 97, 100.) "A consideration is not essential to the validity of bills of exchange and negotiable notes, if they have been negotiated and passed into the hands of innocent purchasers." (2 Kent's Comm., 593; Jones *v.* Holliday, 11 Tex., 414.)

"The true test to determine whether a note is subject to an equity set up by the maker, is this: Could the payee, at the time he transferred the note, have sustained a suit upon it against the maker, if it had then matured?" (Furniss *v.* Gilchrist, 1 Sandf., (N. Y.,) 58.) Apply this test to the bill in hand.

7. Could the damages that Stark claims to have suffered by reason of the breach of warranty, be pleaded against

the bill, even if it had never passed from the hands of the Washington Iron Works, and they had brought suit upon it against Stark? We think the law cited above, from Benjamin on Sales, 685, and that from Parsons on Notes, vol. 1, pages 207–210, and notes, determines this question in the negative beyond a doubt. Our own statute (Paschal's Dig., art. 3447) affirms the same principle: "If the suit be founded on a certain demand, the defendant shall not be permitted to set off unliquidated or uncertain damages, founded on a tort, or breach of covenant on the part of the plaintiff." Whether Stark's plea of damages be called a "set-off" or a "plea in reconvention," he certainly seeks to set off the amount due on the bill by damages to that extent; and we insist that the statute above cited settles the law against his plea. (See, also, Thomas *v.* Hill, 3 Tex., 270; Duncan *v.* Magette, 25 Tex., 250.)

In some respects, though not in a strict commercial sense, Alford & Veal may be considered accommodation acceptors. All the evidence goes to show that Alford & Veal had no funds of Stark's in their hands to meet this bill at the time of, or after, their acceptance. Would they not, in that event, have recourse upon the drawer? "Acceptor paying without any funds of drawer is entitled to recovery from drawer." (Story on Bills, sec. 120.) Stark is the remote indorser, and, in one respect, Alford & Veal indorsees. "In an action between indorsee and remote indorser, if any intermediate holder between the defendant and the plaintiff gave value for the bill, that intervening consideration will sustain the plaintiff's title." (Byles on Bills, 194, 61, note; 1 Parsons on Notes and Bills, 184.)

Notice of defenses against a bill does not, in all cases, operate to the injury of a holder; for "if the present holder has such notice, if he derive a title to the bill from a prior *bona-fide* holder, he can recover the full amount." (Story on Bills, sec. 188.) The Washington Iron Works Company were *bona-fide* holders, and Alford & Veal, by virtue of the assignment

of the deed of trust, were subrogated to all the rights of the
Washington Iron Works Company. (See Parsons v. Brid-
dock, 2 Vt., 608; Hodson v. Shaw, 3 M. & K., (8 Eng. Ch.,)
388; Sublett v. McKinney, 19 Tex., 444; 4 Ga., 343; Jordan
v. Hudson, 11 Tex., 82.)

8. The measure of damages was improperly given by the
court. The ruling made was: "That where there is a breach
of warranty of chattels, accompanied with fraud, the pur-
chaser can return the goods, and recover from the vendor
whatever cost price he has paid for them, together with rea-
sonable or necessary cost for returning the same. If, how-
ever, there is no fraud, and the warranty goes to the fitness
of the goods, the purchaser cannot return the goods, but may
recover as damages the difference in value between the arti-
cle that was delivered and the article that was warranted,
together with any immediate consequential damage that he
may have sustained by reason of the breach of warranty."

This is certainly the law as laid down by Story on Con-
tracts, vol. 2, sec. 850, but is not law.

"In general, when a buyer asserts that the goods he pur-
chased are not what they were warranted to be, or are so
different from what he ordered as to give him the right to
rescind and avoid the sale, he must forthwith return the
goods. Delay in doing so, or any act equivalent to accept-
ance, after he knows their deficiency, would be construed
either into an admission that there was no such deficiency,
or into a waiver of his right to rescind the sale because of
such deficiency." (1 Parsons on Contracts, 393.)

In a note on page 592, in a case cited from 8 Cowan, by
the same author, the law is stated to be: "Where the pur-
chaser does not return the goods, the measure of damages
is the difference between the value of the article delivered
and that of the article warranted." We have the same rule
in Sedgwick on Damages, in note 2, pp. 344–349.

In the latter part of note 2 above referred to, Mr. Sedg-
wick says: "But if the purchaser does not rescind on dis-

covering the fraud, and if having an opportunity to return the property he does not do so, he cannot recover the entire value, although it becomes lost to him through a fault warranted against."

In the text, at the top of the same page, he cites a New York case, to show, that in any event the "purchaser can recover only the difference between the value of the article as it is in fact, and as it ought to have been."

Our own Supreme Court have affirmed this rule in Anderson v. Duffield, 8 Tex., 237; Scranton v. Tilley, 16 Tex., 183; De La Zerda v. Korn, 25 Tex. Supp., 193, 194; Anding v. Perkins, 29 Tex., 355.

In Hubby v. Stokes, 22 Tex., 217, the court say: "A special warranty of the soundness of a slave to the extent of the warrantor's knowledge and belief, does not subject him to damages, though the negro be worthless, in the absence of proof of knowledge in the warrantor." And in the case cited above from 8 Texas, 287, they say: "But if the warranty be unqualified, purchase-money with legal interest is the measure of the damages." This last seems to have been an extreme case. The rule as laid down, is that which is applicable to "express" warranties, and cases in which the warrantor was cognizant of the defects that were warranted against. In the case at bar, the warranty, at most, is only "implied," and the defect complained of could not have been known to the seller.

We insist, that in an action directly against the Washington Iron Works Company, Stark could not recover damages for the profits that he might have derived from the mill during the time that it was idle. This is the law in Story on Contracts, vol. 2, secs. 849 and 849a, and illustrated by the celebrated boat case. (Blanchard v. Ely, 21 Wend., 344.) In that case, the plaintiff brought suit for the price; the circuit judge would not permit the jury to allow for delays or for profits which might have been made upon the trips lost. The Supreme Court sustained the charge of the judge.

In a mill case cited in note 1, p. 74, Sedgwick on Damages, "a claim for a loss of net profits calculated from the amount of lumber the mill might have cut and planed, taking into account the usual prices for planing, over running expenses and wear and tear, was rejected as too uncertain." In another case, Judge Bronson said: "Profits on manufacture of marble from rough material are not allowed, because of this uncertainty."

In this case, the counsel for Alford & Veal excepted to the admission of evidence in the form of estimates of profits, because such estimates were too uncertain and contingent— depending upon several contingencies, and especially in the fluctuations of the lumber market, caused by the demand and supply. The rule is thus laid down in the case that Mr. Sedgwick, in his work on Damages, note on page 81, calls the leading American case (Griffin *v.* Colver, 16 N. Y., 489): "The damages must be certain, both from their nature and the cause from which they proceed." In another case, in a note on page 434, Sedgwick on Damages, Justice Small lays down what the author indorses as law. We ask the attention of the court to the fourth rule there given, viz.: "Loss of profits in business cannot be allowed as damages, unless the data of estimate are so definite and certain that they can be ascertained reasonably by calculation." Also the fifth, viz.: "If the contract was made with reference to embarking in a new business, such as sawing lumber, the speculative profits which might have been expected, but which were defeated, cannot be looked to as an element of damage." Also the seventh, viz.: "The party injured must not remain inactive, but should make reasonable exertions to help himself, and diminish the responsibility of the person in default to him."

In a note on page 359, Sedgwick on Damages says: "Where there is a sale on fraudulent representations, the damages are the difference between the actual value of the property, and its value estimated by such representations as

were not only false, but fraudulently made." The same law is also found in Benjamin on Sales, 585.

For damages on breach of warranty of fitness, the law is thus laid down in Parsons on Contracts, viz.: "The purchaser can have no other compensation than that which would make up the difference between what the goods are and what they ought to be." (See Sedgwick on Damages, note 3, p. 349; 29 Tex., 348.) If not returned, damages are reduced by the use of the thing bought. (16 Tex., 183; 17 Tex., 385; 13 Tex., 324; 25 Tex. Supp., 193.)

9. This is not a case where damages can be given for attorney's fees and cost of litigation, unless it be to Alford & Veal, it being an "honest effort to collect a just debt." (See Walcott v. Hendrick, 6 Tex., 409.) Attorney's fees would be excluded on the authority of Brown's Administrator v. Tyler et al., 34 Tex., 168.

10. The kind of machinery, its quality, and price were set forth in the written contract, and proof of any warranties outside of this was inadmissible. "Antecedent representations made by the vendor as an inducement to the buyer, but not forming a part of the contract, are not warranties where there is a written contract; to be valid as warranties, they must enter into and form a part of the contract." (Benjamin on Sales, 45; Roberts v. Short, 1 Tex., 373; Epperson v. Young, 8 Tex., 135; 12 Tex., 50; 14 Tex., 604; 24 Tex., 643; 25 Tex., 87; Self v. King, 28 Tex., 553; 29 Tex., 52.) "Nor can the purchaser rely upon statements and assertions made by the maker of articles in circulars and advertisements, as warranties." (1 Parsons on Contracts, 588.)

MOORE, ASSOCIATE JUSTICE.—On the 26th of April, 1871, the appellant, J. R. Stark, purchased of the Washington Iron Works, a corporation of the State of New York, through their agent, E. S. Blizard, machinery for erecting a saw and grist mill, for which he was to pay said Washington Iron Works $3,066. Of this sum, appellant agreed and paid to

said Blizard, agent for said corporation, through George F. Alford & Veal, a commission house in the city of Galveston, in accordance with the stipulations of his contract, the sum of $1,650 in cash, on or about the 25th of May, 1871, on the arrival of said machinery at the port of Galveston; and at the same time, in further pursuance of the terms of said contract, appellant drew a draft on said George F. Alford & Veal, payable to his own order, at four months from the arrival of said machinery in Galveston, for the sum of $1,416, which said draft appellant indorsed and delivered to said Blizard for said corporation, in payment of the balance, as agreed by said contract, to be paid for said machinery. Said draft was accepted by said George F. Alford & Veal, for the accommodation of appellant, by letter addressed to said Blizard at the time the agreement for the sale and purchase of the machinery was made. Appellant also, at the same time, executed and delivered to said Washington Iron Works a deed of trust on all of said machinery sold him as aforesaid, with authority to sell the same, or to appoint a trustee to this end, if said draft should not be punctually paid when the same became due according to its tenor and effect.

The machinery appears to have arrived in Galveston about the 25th of May, 1871, and to have been forwarded at once, by said George F. Alford & Veal, to appellant, in Houston county, where, as was well understood by all parties, the proposed mill was to be erected, and where it arrived in the latter part of the following month. On or about the 5th of July, 1871, appellant completed the erection of said mill, and got said machinery in place, ready to commence business, when for the first time he discovered, as he alleges, that said machinery was radically defective in its construction, and entirely insufficient to perform the service for which it was purchased, and was in many essential particulars altogether different from what said Washington Iron Works had by its contract undertaken and bound itself, through its said agent,

to furnish and deliver to him.   Appellant seems promptly to have informed said Blizard, the agent of said corporation, as well as said George F. Alford & Veal, of the alleged defects in said machinery, and to have instructed the latter parties, a month or more before said draft fell due, not to pay the same, because of a failure of consideration, by reason of the defective and insufficient character of said machinery. Alford & Veal claim, however, though they gave no information of the fact to appellant until after the bill fell due, that they purchased said bill from said Washington Iron Works, for value, on the 3d of June, 1871, long before it was due, and without notice of the supposed defects in said machinery, or of the alleged failure of the consideration for which it was given; and also that said deed of trust, given by appellant to secure the payment of said draft, as before stated, was at the same time, for a valuable consideration, assigned and transferred to them.

The draft not being paid when it fell due, and appellees threatening to enforce the trust deed by a sale of the machinery therein conveyed, appellant instituted this suit, for the purpose of enjoining appellees, Alford & Veal, from enforcing the collection of said draft or bill by the sale of said machinery under said trust deed; to recover from said Washington Iron Works and its agent, said Blizard, direct and consequential damages for the alleged defects in said machinery, and such as is claimed to have resulted to him therefrom; and also damages from said George F. Alford & Veal for fraudulent collusion with said Washington Iron Works, and for the alleged wrongful and oppressive conduct on the part of said Alford & Veal in their efforts to effect a sale of said machinery under said trust deed.

It would be a wearisome as well as bootless task to follow the sinuous tergiversations of this voluminous record.   From the inception of the case to its termination, it is marked by obvious and glaring improprieties and irregularities, which must be reprobated, even if they were not calculated to dis-

tract attention from the real issues in the case, or to embarrass its correct determination.

The leading and essential issues which the proper determination of the case involve, are neither numerous nor of difficult solution. The first and leading question to be decided, is whether the machinery delivered by the Washington Iron Works to appellant was, in quantity, capacity, and quality, such as stipulated in the contract. If not, appellant is entitled to a judgment against said corporation, if it has been properly brought into court, for the difference in the value of the machinery actually delivered and that contracted for. (Wright *v.* Davenport, 44 Tex., 164.) This difference may be shown by witnesses who are able to state the difference, taking the contract price and expense of delivery as the basis for estimating the difference in value between the machinery actually delivered and that contracted for; or the difference may also be shown by satisfactory proof of the reasonable cost of supplying the deficiencies or removing the defects of the machinery delivered, if this has or could be done. If there was fraud or an express warranty, the measure of damages would of course be different. But we see nothing in the record requiring a discussion of the rule applicable in such cases; and certainly we are at a loss to conceive upon what ground the court held that appellant was entitled to the contingent and speculative damages which the jury were authorized to find. No appeal has been prosecuted from the judgment by the Washington Iron Works; but it has been deemed appropriate to make this reference to the judgment against it, to guard against similar errors on another trial, if it should be a party to the suit.* It may be well, also, to say, that there was no return by the officer to whom the citation to the Washington Iron Works was issued. The

---

*NOTE.—The jury found a verdict for $6,000 damages against the Washington Iron Works, for which judgment was rendered in favor of Stark.

court, therefore, had no jurisdiction of it when it rendered judgment against it by default.

If there was a fraudulent combination between the Washington Iron Works and Alford & Veal to cheat and defraud appellant, or if Alford & Veal were parties to and interested with said iron works in the contract, then they are equally responsible with it for whatever damage appellant may have sustained from a breach of the contract. But if they had no such interest, appellant has no right of action against them, unless there has been a failure of consideration, which he can set up against the bill in their hands; or he has a right to enjoin a sale of the machinery under the trust deed. The claim for damages for endeavoring to enforce the deed of trust and the payment of the bill, which they accepted for appellant's accommodation, if they were justly entitled to have the property sold under the trust deed for their benefit, seems scarcely worthy of serious notice.

The important question in the case, so far as Alford & Veal are concerned, depends upon the right acquired by their payment or purchase of the bill before it became due, and without notice of appellant's defense. Of course, no one can question, if Alford & Veal were strangers to the bill, and purchased it for value, without notice of the failure of consideration, no such defense could be made to it in their hands. But whether the same can be said in regard to the deed of trust, in view of our statutes relating to assignment of written instruments, admits of more question; though the weight of authority seems to hold that the purchaser gets a mortgage, given as collateral security, like the bill, free from the equities of the payee against the indorsee. (1 Danl. on Neg. Iust., 628, 629.) But as this point, though it may be important in the ultimate determination of the case, has not been considered or discussed by counsel, and is not essential to its present decision, it will not be definitely determined.

But unless Alford & Veal can shut out appellant from such defenses to the bill as might be made to it in the hands of the

Washington Iron Works, unquestionably they cannot deny his right to defend against the deed. How stands the matter, then, upon the bill? They were the acceptors, and on the face of the paper were primarily responsible. When it was paid, therefore, it had filled its destiny: its obligation was discharged. It cannot, consequently, be said that the acceptor, when he takes up the bill, is the holder, in the sense of the law merchant. (Chitty on Bills, 249.) True, when the acceptance is for the accommodation of the drawer, as between themselves the acceptor is a surety for the drawer, and may maintain an action against the drawer for whatever he may be forced to pay for him by reason of his acceptance. But it seems he does not sue in such case on the bill, but for money had and received, of which the bill, in connection with evidence that his acceptance was for accommodation, furnishes proof of the amount so paid. (Planters' Bank *v.* Douglass, 2 Head, 699; Danl. on Neg. Inst., 395.)

It is universally admitted, that the consideration of negotiable paper may be inquired into between those with whom there is a privity; "that is to say, between the intermediate parties to any contract evidenced by the drawing, accepting, making, or indorsing a bill or note, it may be shown that there was no consideration," &c. (1 Danl. on Neg. Inst., 135.) It may be, if the drawer had permitted his accommodation acceptor to pay the note without notice of failure of consideration, as between him and the payee it would be too late afterwards for him to complain. But the acceptor's obligation is to pay when the bill is due, and not before; (Chitty on Bills, 248, 431; 2 Danl. on Neg. Inst., 233; Burbridge *v.* Manners, 3 Campb., 193; 8 Conn., 505; 2 McCord, 246;) and he should not be permitted to deprive the drawer of a defense to the bill, by assuming to pay it before he is bound to do so. He cannot, by paying the bill out of due course, change the relationship of the original parties to it and to each other, and thus cut off the drawer from the opportunity of defending himself against the payment of a bill for

which he has received no valuable consideration.    True, this would have been his condition if the bill had been transferred before due to a stranger, who purchased it for value, without notice; but the rights which a stranger acquires by the transfer of commercial paper are in many respects altogether different from those which the original parties have.    It is essential, in order to give credit and circulation to such paper, that this should be so.

The court erred in holding that if appellees, Alford & Veal, paid the note before it was due, its consideration could not be impeached.    Nor was the real question, touching appellant's right to enjoin the collection of the bill, or diminish his liability upon it, submitted to the jury by the issue presented to them in the charge.    Though Alford & Veal may not have been guilty of fraudulent conduct in their transaction with Blizard and appellant, concerning the sale of the machinery or the payment of the draft, yet, by their payment of the draft before it was due, they subjected themselves to such defenses as appellant might be entitled to make to or against the Washington Iron Works.    If they claim that they were in fact the sureties of appellant, and by payment of his debt are subrogated to the rights of the payee, it must also be held, that by thrusting themselves between appellant and the payee, by paying the bill otherwise or at a different time from that to which their acceptance bound them, they have subjected themselves to the defenses which they could have made to it if it had remained in the hands of the payee.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.